996 F.2d 1366
 61 USLW 2784, 1993 Copr.L.Dec. P 27,111,
27 U.S.P.Q.2d 1001,
21 Media L. Rep. 1545
 TWIN PEAKS PRODUCTIONS, INC., Plaintiff-Appellee-Cross-Appellant,
v.
PUBLICATIONS INTERNATIONAL, LTD., Louis N. Weber, Scott
Knickelbine, and Penguin USA, Inc.,
Defendants-Appellants-Cross-Appellees.
 Nos. 919, 1392, Dockets 92-7933, 92-7985.
 United States Court of Appeals,
Second Circuit.
 Argued March 1, 1993.
Decided June 7, 1993.
As Amended July 6, 1993.
 
 Dorothy M. Weber, New York City (Eugene L. Girden, Margaret Ferguson, Shukat Hafer & Weber, on the brief), for defendants-appellants-cross-appellees.
 Richard Lehv, New York City (Weiss Dawid Fross Zelnick & Lehrman, on the brief), for plaintiff-appellee-cross-appellant.
 Before: NEWMAN and WINTER, Circuit Judges, and CARMAN,* Judge, United States Court of International Trade.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal requires adjustment of the competing rights of authors under circumstances where the work of a second author contains both comment on a well-known work of a first author and substantial portions of the normally protectable expression contained in the first work. The appeal presents several copyright and trademark issues arising out of defendants' publication of a book about plaintiff's popular television program "Twin Peaks." The major copyright issue is whether a book containing a detailed summary of the plot of a fictional work constitutes fair use of the fictional work. We must also decide questions concerning the scope of trademark protection for literary titles and several issues concerning copyright damages.
 
 
 2
 The issues arise on the appeal of defendants Publications International, Ltd. ("PIL"), Louis N. Weber, Scott Knickelbine, and Penguin USA, Inc. and the cross-appeal of plaintiff Twin Peaks Productions, Inc. ("TPP") from the July 29, 1992, judgment of the District Court for the Southern District of New York (John S. Martin, Jr., Judge) finding that the defendants' book infringed copyrights in the scripts for several episodes of the television program "Twin Peaks" and also infringed the trademark TWIN PEAKS. 778 F.Supp. 1247 (1991). The judgment enjoined publication of the book and use of the trademark, and awarded damages and attorney's fees totaling nearly $280,000. We affirm as to copyright liability, vacate and remand as to trademark liability, affirm as to copyright damages, and vacate and remand as to attorney's fees.
 
 Background
 
 3
 "Twin Peaks" premiered on ABC in April 1990. The first eight episodes received high ratings--up to a third of the nation's television viewers--and extensive positive press coverage. See William Grimes, Welcome to Twin Peaks and Valleys, N.Y. Times, May 5, 1991, § 2, at 1. The second season of the show was far less successful, leading to its cancellation in June 1991. The producer of the show, TPP (formerly Lynch/Frost Productions) obtained copyright registrations and owns the unregistered trademark TWIN PEAKS.
 
 
 4
 In October 1990, PIL published "Welcome to Twin Peaks: A Complete Guide to Who's Who and What's What" ("the Book"), based on the first eight episodes. The 128-page book has seven chapters, dealing with, respectively, (1) the popularity of the show; (2) the characters and the actors who play them; (3) the plots of the eight episodes, some commentary on the plots, and "unanswered questions"; (4) David Lynch, the creator of the show; (5) Mark Frost, the producer of the show, and Snoqualmie, Washington, the location of the show; (6) the music of the show; and (7) trivia questions and quotations constituting the "wit and wisdom of Agent Cooper," one of the characters. The cover of the book contains a disclaimer, indicating that PIL is not affiliated with Lynch/Frost Productions, ABC, and various other entities. The book was written by defendant Scott Knickelbine and distributed by defendant Penguin USA, Inc., under its SIGNET imprint. Defendant Louis N. Weber is the president of PIL.
 
 
 5
 Upon publication, PIL was threatened with a copyright action by Simon & Schuster, which holds certain book rights to the "Twin Peaks" programs. PIL responded by instituting a declaratory judgment action against Simon & Schuster in the Northern District of Illinois. TPP made its own demand that PIL cease production of the Book, and PIL amended its complaint in the declaratory judgment action to add TPP as a defendant. TPP moved successfully to dismiss the action against it for lack of personal jurisdiction. See Publications International, Ltd. v. Simon & Schuster, Inc., 763 F.Supp. 309 (N.D.Ill.1991). The litigation between PIL and Simon & Schuster was settled in February 1991 by an agreement allowing PIL to continue publication of the Book with certain modifications.
 
 
 6
 TPP then filed the instant action in the Southern District of New York, alleging copyright infringement, trademark infringement, unfair competition, and trademark dilution. The parties cross-moved for summary judgment on liability, stipulating that there were no disputed issues of fact. The District Court found for TPP on the copyright, trademark, and unfair competition claims, and for PIL on the trademark dilution claim. The Court rejected fair use and First Amendment defenses asserted by PIL. The parties then agreed to submit the damages issues on papers, but PIL subsequently requested an evidentiary hearing limited to the issue of willfulness. Following this hearing, the District Court determined that PIL had willfully infringed TPP's copyrights. The Court enjoined further copyright or trademark violations, and awarded TPP the following damages: (1) against PIL, either statutory damages of $120,000 or actual damages (based on a reasonable royalty) of $125,000, at TPP's option; (2) against Penguin, $26,584, constituting Penguin's profits; (3) against Knickelbine, $3,000, constituting his profits; and (4) against PIL, $130,324.25 in attorney's fees, constituting TPP's fees in both the Illinois and New York actions. The Court also determined that PIL's profits were $52,108, but declined to award this sum in addition to statutory damages or a reasonable royalty.
 
 
 7
 On appeal, PIL attacks the findings of copyright and trademark liability, the finding of willfulness, several aspects of the calculation of damages, and the award of attorney's fees. In its cross-appeal, TPP contends that it should have been awarded PIL's profits in addition to actual damages. TPP also seeks to recover fees expended on this appeal.
 
 Discussion
 I. Copyright Liability
 
 8
 Initially, we note some confusion in TPP's identification of the works alleged to be infringed. The complaint alleges copying of "the Program," a phrase used in the complaint to mean the "television series entitled 'Twin Peaks.' " There is no claim in the complaint that the videotapes of the episodes as televised were ever registered. Judge Martin's opinion granting summary judgment found infringement of the copyright in the teleplays (scripts), but the injunction prohibits infringing the copyrights in the "program." At oral argument in this Court, in response to a question, TPP said that copyright registrations had been obtained only for the teleplays. However, in a post-argument submission, TPP sought to correct that response. TPP asserted that a copyright registration had been obtained for the script of the first episode, that copyright registrations had been obtained for the televised videotapes of the seven subsequent episodes, and that a separate copyright registration had later been obtained for the televised videotape of the first episode. As the ensuing discussion reveals, our disposition of the copyright issues is ultimately unaffected whether TPP's registrations apply to the teleplays, to the televised episodes, or, as alleged for the first episode, to both the teleplay and the televised episode.
 
 A. Prima facie copyright liability
 
 9
 PIL first makes several related attacks on the District Court's determination that, at least absent a fair use or First Amendment defense, PIL infringed TPP's copyrights. To make out a prima facie case of copyright liability, the copyright holder must prove "ownership of a valid copyright, and ... copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, ----, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The plaintiff may establish copying either by direct evidence or by showing that the defendant had access to the plaintiff's work and that the two works are substantially similar. See Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1092 (2d Cir.1977).[1] PIL contends that the District Court erred in finding that PIL had access to the teleplays, that substantial similarity existed between the Book and the teleplays, and that the Book was a derivative work of the teleplays.
 
 
 10
 1. Access. PIL argues that because there is no evidence that it had access to the teleplays, TPP's infringement claim fails as a matter of law. Yet PIL has conceded that it had access to the broadcast programs, and does not dispute that the broadcast programs contained virtually all of the protected expression in the teleplays. In isolated instances, dialogue quoted in the Book varies slightly from dialogue as set forth in the teleplays, presumably resulting from variations that occurred in the course of making the television programs, but these instances are insignificant. One who views a performance of a copyrighted work and copies expression contained in that work may be found to have infringed. See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.03[C], at 2-32 (1992) (hereafter "Nimmer"). In the circumstances of this case, we hold that PIL's access to the televised programs serves as the functional equivalent of access to the protectable content of the teleplays. Thus, if, as the District Court thought, TPP's registrations applied to the teleplays, access was adequately shown. Alternatively, if, as TPP now alleges, registrations were obtained for the televised episodes, access is undisputed.
 
 
 11
 2. Substantial similarity. PIL next argues that the District Court erroneously applied a "literal similarity" test instead of a "substantial similarity" test in concluding that the Book copied the teleplays. We find no error. PIL fails to recognize that the concept of similarity embraces not only global similarities in structure and sequence, but localized similarity in language. In both cases, the trier of fact must determine whether the similarities are sufficient to qualify as substantial. See 3 Nimmer § 13.03[A], at 13-28 to 13-29 (1992) (substantial similarity can take the form of "fragmented literal similarity" or "comprehensive nonliteral similarity"). In this case, two chapters of the Book (chapters 3 and 7) consist of extensive direct quotations from the teleplays. Indeed, PIL concedes that 89 lines of dialogue were taken. TPP claims that a far greater amount was taken. But even on PIL's concession, the District Court was entitled to find that the identity of 89 lines of dialogue between the works constituted substantial similarity. See Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 548, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) (finding substantial similarity where defendant's work excerpted 300-400 words including some uncopyrightable material).
 
 
 12
 Moreover, while the District Court confined its inquiry to literal similarity, we have little doubt that the record supports a finding of substantial similarity through comprehensive nonliteral similarity. Chapter 3 of the Book is essentially a detailed recounting of the first eight episodes of the series. Every intricate plot twist and element of character development appear in the Book in the same sequence as in the teleplays. The elaborate recounting of plot details consumes 46 pages of Chapter 3. The degree of detail is illustrated by excerpts set out in the margin.[2]
 
 
 13
 3. Infringement of the right to make derivative works. PIL further contends that the District Court erred in finding that the Book infringed not only rights in the teleplays but also the right to make derivative works of the teleplays. The finding that the Book was a derivative work would seem unnecessary to the finding of prima facie infringement. See 2 Nimmer § 8.09[A], at 8-114 (right to make derivative works is "completely superfluous," since infringement of the adaptation right necessarily infringes the reproduction right or the performance right). Nevertheless, we believe the District Court was correct in determining that the Book constituted a "derivative work[ ] based upon the copyrighted work." 17 U.S.C. § 106(2) (1988). The Book contains a substantial amount of material from the teleplays, transformed from one medium into another. See Rogers v. Koons, 751 F.Supp. 474, 477 (S.D.N.Y.1990), aff'd, 960 F.2d 301 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).
 
 B. Fair use
 
 14
 The central issue on the copyright claim is the fair use defense. This long-standing doctrine tempers the protection of copyright by allowing an author to use a limited amount of copyrighted material under some circumstances. Since 1978, the doctrine has been codified in section 107 of the Copyright Act, 17 U.S.C. § 107 (1988 & Supp. III 1991), which provides that "the fair use of a copyrighted work, ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright." In determining whether a use is fair, a court is to consider four enumerated factors, see id. § 107(1)-(4),[3] although these factors are non-exclusive, see Harper & Row, 471 U.S. at 560, 105 S.Ct. at 2230.
 
 
 15
 Judge Martin applied each of the four statutory factors and found that all of them favored TPP. He thought that the Book was not entitled to favorable consideration as having either an educational purpose or a character as commentary, that the teleplays were creative works entitled to heightened protection, that substantial copyrighted material was taken, and that the Book competed with books currently licensed by TPP as well as possible future derivative works. Because "[f]air use is a mixed question of law and fact," Harper & Row, 471 U.S. at 560, 105 S.Ct. at 2230, the District Court's conclusion "is open to full review on appeal," New Era Publications International, ApS v. Carol Publishing Group, 904 F.2d 152, 155 (2d Cir.), cert. denied, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990), although subsidiary findings of fact will be upheld unless clearly erroneous, see Fed.R.Civ.P. 52(a).
 
 
 16
 We agree with the appellants that the Book serves one or more of the non-exclusive purposes that section 107 identifies as examples of purposes for which a protected fair use may be made. See Harper & Row, 471 U.S. at 561, 105 S.Ct. at 2231. Though it might be extravagant to consider the Book a work of "research" or "scholarship," it is surely a work of "comment," and perhaps has some claim to "criticism" and "news reporting." It is a work of and about pop culture, but that does not remove it from the scope of section 107. Courts must be alert to the risk of permitting subjective judgments about quality to tilt the scales on which the fair use balance is made. A comment about a television program is no less entitled to the defense of fair use because its subject is a program of mass appeal and the author aims his comment at a lowbrow audience. A comment is as eligible for fair use protection when it concerns "Masterpiece Theater" and appears in the New York Review of Books as when it concerns "As the World Turns" and appears in Soap Opera Digest. And the defense will be available whether the comment makes some erudite point appreciated mainly by students of literature or a more prosaic point of interest to average television viewers. The issue in either case will ultimately be whether the comment, in borrowing the protected expression of the original work, does so for purposes that advance the interests sought to be promoted by the copyright law. Determination of that issue turns on careful consideration of the four statutory factors.
 
 
 17
 1. Purpose and character of the use. The District Court's analysis of purpose and character was limited to a determination that PIL's purpose was commercial and not educational. Though we ultimately assess the first factor as favoring TPP, a more extended analysis is warranted.
 
 
 18
 "Purpose" in fair use analysis is not an all-or-nothing matter. The issue is not simply whether a challenged work serves one of the non-exclusive purposes identified in section 107, such as comment or criticism, but whether it does so to an insignificant or a substantial extent. The weight ascribed to the "purpose" factor involves a more refined assessment than the initial, fairly easy decision that a work serves a purpose illustrated by the categories listed in section 107.
 
 
 19
 The statutory language of the first factor plainly assigns a higher value to a use that serves "nonprofit educational purposes" than to one of a "commercial nature." Yet we do not think that an author's commercial purpose in writing a book precludes a finding that his particular use of a prior author's protected expression serves a purpose that weighs favorably on the fair use scales. Most publishers of traditional "educational" works hope to make a profit, and in many cases, including this one, publishers of traditional "commercial" work have at least the pretense and often the reality of enlightening the public. See Salinger v. Random House, Inc., 811 F.2d 90, 96 (2d Cir.), cert. denied, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987).
 
 
 20
 We have found fair use in works that are plainly "commercial." See Consumers Union of United States, Inc. v. General Signal Corp., 724 F.2d 1044, 1049 (2d Cir.1983) (advertisement disclosing Consumer Reports recommendation), reh'g denied, 730 F.2d 47 (2d Cir.), cert. denied, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); Warner Bros., Inc. v. American Broadcasting Companies, Inc., 720 F.2d 231, 242 (2d Cir.1983) (television series parodying Superman); Elsmere Music, Inc. v. National Broadcasting Co., 623 F.2d 252, 253 n. 1 (2d Cir.1980) (Saturday Night Live skit parodying "I Love New York" song); Berlin v. E.C. Publications, Inc., 329 F.2d 541, 544-45 (2d Cir.) (Mad Magazine parodies of Irving Berlin songs), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). But see Consumers Union, 730 F.2d at 48 (Oakes, J., dissenting from denial of rehearing in banc) (contending that advertising use is never proper purpose). However, we have also rejected a fair use defense for works that could be characterized as "commercial exploitation." See Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57, 61 (2d Cir.1980) (ABC telecasts containing portions of film on wrestler were "commercial exploitation"); Meeropol v. Nizer, 560 F.2d 1061, 1069 (2d Cir.1977) (summary judgment inappropriate since book containing Rosenberg letters could constitute "commercial exploitation"), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). Whether "exploitation" is an analytically useful term or only a label attached to works deemed not protected by the fair use defense is debatable. We have been more solicitous of the fair use defense in works, which though intended to be profitable, aspired to serve broader public purposes. See Wright v. Warner Books, Inc., 953 F.2d 731, 736-37 (2d Cir.1991) (biography); New Era Publications International, ApS v. Carol Publishing Group, 904 F.2d at 156-57 (biography); Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1260-62 (2d Cir.1986) (scholarly book on attitudes toward abortion), cert. denied, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987); Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 307-09 (2d Cir.1966) (biography), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).
 
 
 21
 PIL's use of the protected expression in the teleplays consists primarily of summarizing in great detail the plots of the first eight episodes. Inevitably, some identification of the subject matter of a writing must occur before any useful comment may be made about it, and it is not uncommon for works serving a fair use purpose to give at least a brief indication of the plot. Works of criticism, teaching, and news reporting customarily do so. In identifying plot, the author of the second work may or may not be said to have made what Judge Leval has usefully called a "transformative" use. See Pierre N. Leval, Toward a Fair Use Standard, 103 Harv.L.Rev. 1105, 1111 (1990). Such use would occur, for example, if a plot was briefly described for purposes of adding significant criticism or comment about the author's plotting technique.
 
 
 22
 In the pending case, PIL's detailed report of the plots goes far beyond merely identifying their basic outline for the transformative purposes of comment or criticism. What PIL has done is simply to recount for its readers precisely the plot details of each teleplay. Whether such a detailed summary serves a purpose that weighs in favor of fair use requires some consideration of a genre often called "abridgments."
 
 
 23
 Recognized in the Copyright Act as a form of "derivative work," see 17 U.S.C. § 101 (1988), an abridgment is a "condensation; contraction. An epitome or compendium of another and larger work, wherein the principal ideas of the larger work are summarily contained." 1 Bouvier's Law Dictionary 91 (3d rev. 1914). Interestingly, the origin of the fair use doctrine is closely connected to abridgments, and early cases went so far as to suggest that an abridgment always constitutes fair use, at least one that is "a real and fair abridgment" displaying "the invention, learning, and judgment" of the abridger, and not merely an instance of a work that has been "colourably shortened." See Gyles v. Wilcox, 26 Eng.Rep. 489, 490, 2 Atk. 141, 143 (1740) (No. 130).
 
 
 24
 The leading early American decision on the fair use defense, Folsom v. Marsh, 9 F.Cas. 342 (C.C.D.Mass.1841), concerned the publication of George Washington's letters in a scholarly work. Justice Story wrote that "a fair and bona fide abridgment of an original work, is not a piracy of the copyright of the author," and that to constitute an abridgment, the second work must contain "real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." Id. at 345. In concluding, with an expression of regret, that the copyright in Washington's letters had been infringed, Justice Story noted that "[i]f it had been the case of a fair and bona fide abridgment of the work of the plaintiffs, it might have admitted of a very different consideration." Id. at 349.
 
 
 25
 Despite these historically interesting suggestions, it is no longer the law that a "real and fair abridgment" is always fair use. As early as 1911, the Circuit Court for the Southern District of New York indicated in dictum its readiness to enjoin an abridgment of a copyrighted work. In declining to issue a preliminary injunction against publication of defendant's book "Opera Stories," which included very brief summaries of two of plaintiff's copyrighted operas, the Court relied on the fact that the summaries gave only a "vague, fragmentary and superficial idea of the plot and of the characters," G. Ricordi & Co. v. Mason, 201 F. 182, 182 (C.C.S.D.N.Y.1911), aff'd, 210 F. 277 (2d Cir.1913), and further indicated that
 
 
 26
 [i]f this case involved an abridgment as that word is ordinarily understood, I should be inclined to take a different view of this motion. The defendants' "story," however, is not such an abridgment. The abridgments which have been condemned by the courts involve colorable shortening of the original text, where immaterial incidents are omitted and voluminous dissertations are cut down, but where the characters, the plot, the language and the ideas of the author are pirated.
 
 
 27
 Id. at 183 (emphasis in original). See also G. Ricordi & Co. v. Mason, 201 F. 184 (S.D.N.Y.1912) (denying permanent injunction), aff'd, 210 F. 277 (2d Cir.1913). One of the leading commentators on the fair use doctrine attributes the "condemnation" of abridgments to the adoption of the 1909 Copyright Act, which "abolished the right to make unconsented fair abridgments." William F. Patry, The Fair Use Privilege in Copyright Law 27 (1985); see also id. at 26 (expressing disagreement with early rule permitting abridgments).
 
 
 28
 The current Copyright Act confers no absolute right on non-copyright holders to make abridgments. The Act defines a "derivative work" to include an abridgment, 17 U.S.C. § 101 (1988), and gives the copyright holder the exclusive right "to prepare derivative works based upon the copyrighted work," id. § 106(2) (1988 & Supp. III 1991). An abridgment of a copyrighted work is thus likely to be found to be prima facie infringing. Where, as here, the abridgment serves no transformative function and elaborates in detail far beyond what is required to serve any legitimate purpose, the first factor cannot be weighted in favor of the fair use defense.
 
 
 29
 2. Nature of the copyrighted work. PIL attacks only briefly the District Court's finding that, because the copyrighted work is a work of fiction, the second factor favors TPP. PIL seems to contend that the magnitude of public reaction to the televised programs made the entire content of the teleplays a fact that could be reported and analyzed. Yet the second factor, if it favors anything, must favor a creative and fictional work, no matter how successful. See Stewart v. Abend, 495 U.S. 207, 237-38, 110 S.Ct. 1750, 1768-69, 109 L.Ed.2d 184 (1990); Harper & Row, 471 U.S. at 563, 105 S.Ct. at 2133; 3 Nimmer § 13.05[A], at 13-102.22 & n. 28.7.
 
 
 30
 3. Amount and substantiality of the portion used in relation to the copyrighted work as a whole. PIL erroneously claims that the District Court made no finding of substantiality "in relation to the teleplays or the television series as a whole." Brief for Appellant at 26. In fact, the District Court found that the Book "provides synopses for several episodes, lifting many parts verbatim from the script." Even without this finding, the District Court's determination that the Book was substantially similar to the teleplays so as to be prima facie infringing should suffice for a determination that the third fair use factor favors the plaintiff, whether the copyrighted works are the teleplays or the videotapes. See 3 Nimmer § 13.05[A], at 13-102.24 to 13-102.25 (third prong of fair use inquiry is redundant).
 
 
 31
 PIL also argues that its taking is not great in light of the fact that critical commentary often requires lifting large portions of the original work. Even if that is sometimes so, it does not mean that the third factor favors commenters regardless of the amount of copying. What PIL lifted was plainly substantial in relation to the copyrighted works as a whole.
 
 
 32
 4. Effect of the use upon the potential market for or value of the copyrighted work. The fourth factor, market effect, is "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566, 105 S.Ct. at 2233. In evaluating this factor, a court must consider not only the primary market for the copyrighted work, but the current and potential market for derivative works. See id. at 568, 105 S.Ct. at 2234; Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965, 971 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993). We believe that application of this factor presents a fairly close question, but ultimately we agree with the District Court that the factor favors TPP.
 
 
 33
 In the cases where we have found the fourth factor to favor a defendant, the defendant's work filled a market niche that the plaintiff simply had no interest in occupying. Copyright holders rarely write parodies of their own works, see, e.g., Warner Bros., 720 F.2d at 242-43, or write reviews of them, see Harper & Row, 471 U.S. at 584, 105 S.Ct. at 2242, and are even less likely to write new analyses of their underlying data from the opposite political perspective, see, e.g., Maxtone-Graham, 803 F.2d at 1263-64. On the other hand, it is a safe generalization that copyright holders, as a class, wish to continue to sell the copyrighted work and may also wish to prepare or license such derivative works as book versions or films. In this case, the Book may interfere with the primary market for the copyrighted works and almost certainly interferes with legitimate markets for derivative works. It is possible that a person who had missed an episode of "Twin Peaks" would find reading the Book an adequate substitute, and would not need to rent the videotape of that episode in order to enjoy the next one. See Wainwright Securities, Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 96 (2d Cir.1977) (defendant's abstracts filled demand for plaintiff's financial reports), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). In the derivative market, TPP has already licensed at least two "Twin Peaks" books ("The Secret Diary of Laura Palmer" and "The Autobiography of F.B.I. Special Agent Dale Cooper: My Life, My Tapes"), and states that it plans to license more, or at least claims to have had such plans before the show's popularity subsided. A copyright holder's protection of its market for derivative works of course cannot enable it to bar publication of works of comment, criticism, or news reporting whose commercial success is enhanced by the wide appeal of the copyrighted work. The author of "Twin Peaks" cannot preserve for itself the entire field of publishable works that wish to cash in on the "Twin Peaks" phenomenon. But it may rightfully claim a favorable weighting of the fourth fair use factor with respect to a book that reports the plot in such extraordinary detail as to risk impairment of the market for the copyrighted works themselves or derivative works that the author is entitled to license.
 
 
 34
 Though appellants may be correct in arguing that works like theirs provide helpful publicity and thereby tend to confer an economic benefit on the copyright holder, we nevertheless conclude that the Book competes in markets in which TPP has a legitimate interest, and that the fourth factor at least slightly favors TPP.
 
 
 35
 5. Aggregate fair use assessment. While the four statutory factors are non-exclusive, we do not believe that the various other factors discussed by the parties merit discussion in light of our agreement with the District Court that all of the statutory factors favor TPP. We conclude that the Court's rejection of the fair use defense was entirely correct.
 
 C. First Amendment defense
 
 36
 PIL contends briefly that the First Amendment is broader than the fair use defense and protects its publication of the Book. PIL neither describes the contours of this purported defense nor makes any effort to distinguish our numerous cases that have held that, except perhaps in an extraordinary case, "the fair use doctrine encompasses all claims of first amendment in the copyright field," New Era Publications International, ApS v. Henry Holt and Co., 873 F.2d 576 (2d Cir.1989), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990); see also Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc., 672 F.2d 1095, 1099-1100 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Wainwright Securities, 558 F.2d at 95. This is not the extraordinary case. Whatever non-protectable information PIL seeks to disseminate is hardly inseparable from TPP's copyrighted expression, as perhaps was the case with the Zapruder film of the Kennedy assassination. See Roy Export, 672 F.2d at 1099-1100 & n. 8; Time, Inc. v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968). The First Amendment defense was properly rejected.
 
 II. Trademark Liability
 
 37
 The District Court concluded that notwithstanding PIL's disclaimer, "a substantial number of reasonably prudent purchasers, on seeing the name Twin Peaks as part of the title of the Book would be led to believe that plaintiff was the source of the goods." Accordingly, the District Court found that PIL had violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), and had engaged in unfair competition in violation of New York common law. PIL contends that reversal is required because the District Court failed to find that the TWIN PEAKS mark had a secondary meaning or to apply any of the Polaroid factors, see Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). PIL also contends that independent analysis of these factors supports the conclusion that it did not infringe TPP's trademarks. The parties agree that the resolution of the common law unfair competition claim parallels resolution of the trademark claim. While PIL's point concerning the failure to apply the Polaroid factors has validity, we are also concerned that the District Court failed to recognize the special concerns implicated by Lanham Act claims against titles of works of artistic expression.
 
 A. Secondary meaning
 
 38
 The District Court made no explicit determination that TWIN PEAKS had acquired secondary meaning. We need not determine whether such a showing is required for suggestive literary titles,[4] since the stipulated facts would have required the District Court to find secondary meaning. TPP submitted extensive evidence of the publicity received by the televised episodes, and even PIL concedes that the series was a "media phenomenon." Much of this publicity focused on David Lynch and Mark Frost. Thus "the title is sufficiently well known that consumers associate it with a particular author's work." Rogers v. Grimaldi, 875 F.2d 994, 998 (2d Cir.1989).
 
 
 39
 B. Trademark infringement by literary titles
 
 
 40
 Because of an author's significant First Amendment interest in choosing an appropriate title for his or her work, we have held that literary titles do not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." Rogers v. Grimaldi, 875 F.2d at 999 (footnote omitted). Although Rogers arose in the context of a title using a celebrity's name, we have applied it to the literary title "Cliffs Notes," a literary title apparently not containing the name of a real person, and certainly not of a celebrity. See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc., 886 F.2d 490, 495 (2d Cir.1989) ("[T]he Rogers balancing approach is generally applicable to Lanham Act claims against works of artistic expression....").
 
 
 41
 In this case, there would seem little question that the title is of some artistic relevance to the Book. The question then is whether the title is misleading in the sense that it induces members of the public to believe the Book was prepared or otherwise authorized by TPP.[5] This determination must be made, in the first instance, by application of the venerable Polaroid factors. See Cliffs Notes, 886 F.2d at 495 n. 3. However, the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in Rogers.
 
 
 42
 Unfortunately, the District Court did not apply the Polaroid factors individually or determine whether the likelihood of confusion was so great as to overcome the presumption of Rogers. While we have occasionally endeavored to apply at least some of the Polaroid factors at the appellate level, see Orient Express Trading Co. v. Federated Department Stores, Inc., 842 F.2d 650, 654-55 (2d Cir.1988); Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc., 832 F.2d 1317, 1320-23 (2d Cir.1987), we believe the better course in this case is a remand to allow the District Court the opportunity to fully examine the factors relevant to likelihood of confusion.
 
 
 43
 The need for careful application of the Polaroid factors, assessed in light of Rogers, is underscored by two complicating considerations. The first is PIL's placement of a disclaimer on both the front and rear covers of the Book. See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc., 832 F.2d 1311, 1315-16 (2d Cir.1987); Consumers Union of United States, Inc. v. General Signal Corp., 724 F.2d 1044, 1053 (2d Cir.1983) (injunction not available "where there is any possibility that an explanation or disclaimer will suffice"), cert. denied, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Though the disclaimer partially blunts TPP's attack by alerting readers that the Book has not been licensed by a group of pertinent entities including Capital Cities/ABC, Inc. Television Network Group, it would have been far more effective had it simply stated that the publication has not been prepared, approved, or licensed by any entity that created or produced the well-known TV program "Twin Peaks." Judge Martin expressed the view, without elaboration, that the disclaimer was not "effective."
 
 
 44
 The second special consideration bearing on the Book's title concerns the wording and appearance of the title. The title not only uses the name "Twin Peaks" but precedes the name with the phrase "Welcome to." The title thus copies a legend that appears on a roadside sign in the introduction sequence of each televised episode. Moreover, the book title is presented against a background that appears to be a wooden slab, apparently an attempt to evoke the wooden roadside sign. It is a fair question whether a title that might otherwise be permissible under Rogers violates the Lanham Act when displayed in a manner that conjures up a visual image prominently associated with the work bearing the mark that was copied.
 
 
 45
 These circumstances make a remand especially appropriate.[6] Since TPP concedes that the resolution of the state law unfair competition claim follows trademark infringement liability, we vacate the District Court's determination that PIL engaged in unfair competition as well.
 
 III. Copyright Damages
 
 46
 Under the Copyright Act, the copyright holder may elect between two measures of damages, 17 U.S.C. § 504(a) (1988)--actual damages and profits, id. § 504(b), or statutory damages of between $500 and $20,000 for "all infringements ... with respect to any one work," id. § 504(c)(1). The District Court determined that actual damages under section 504(b) were $125,000 and that statutory damages under section 504(c) were $120,000 (apparently $15,000 for infringement of each of eight teleplays). The District Court also found that PIL's profits were $52,108, but declined to add this amount to the award under section 504(b). PIL challenges the amount of both the statutory award and the actual damages award. TPP seeks to uphold the statutory award and cross-appeals to seek an increase in the actual damages, contending that PIL's profits should have been included.
 
 A. Damages issues open on appeal
 
 47
 Though the parties have disputed on appeal issues relating to both actual and statutory damages, we conclude that TPP's exercise of its right to elect statutory damages against PIL has eliminated from the case all issues concerning actual damages recoverable from PIL. The election available to a plaintiff by section 504(a) is to be made "at any time before final judgment is rendered." 17 U.S.C. § 504(c)(1). In this case, TPP made its choice before final judgment, apparently believing that the statutory award of $120,000 was more likely to be sustained on appeal than the actual damages award of $125,000. We do not think the election continues into the appellate stage. Once a plaintiff has elected statutory damages, it has given up the right to seek actual damages and may not renew that right on appeal by cross-appealing to seek an increase in the actual damages.
 
 
 48
 We do not regard Oboler v. Goldin, 714 F.2d 211, 212-13 (2d Cir.1983), as indicating a contrary rule. In that case, the plaintiff had not elected between remedies prior to judgment, id. at 213, and we therefore permitted it, after remand, to make its choice. But even in that situation, we obliged the plaintiff to choose between statutory damages and a new trial on actual damages; we did not permit the plaintiff, after appeal, to pursue both remedies to a conclusion and then select the one that ultimately proved more favorable.
 
 B. Statutory damages
 
 49
 1. Number of violations. In calculating statutory damages, the District Court apparently concluded that TPP had violated eight separate copyrights--one for each teleplay--and awarded statutory damages of $15,000 per teleplay, for a total of $120,000. Had the District Court not considered eight separate works to have been infringed, statutory damages would have been limited to $20,000 for a non-willful violation and $100,000 for a willful violation. See 17 U.S.C. § 504(c) (1988). Section 504(c) provides for statutory damages "for all infringements involved in the action, with respect to any one work," and further provides that for "purposes of this subsection, all the parts of a compilation or derivative work constitute one work." PIL concedes that each teleplay was separately copyrighted, but contends that they constitute a single work under section 504(c). Presumably, PIL's contention would be asserted whether TPP had registered eight teleplays, as the District Court thought, or eight videotapes of episodes, as TPP now asserts.
 
 
 50
 We last considered the appropriate unit for statutory copyright damages in a case decided under the 1909 Act, Robert Stigwood Group Ltd. v. O'Reilly, 530 F.2d 1096 (2d Cir.), cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976) ("Stigwood "), which concerned the musical "Jesus Christ Superstar." Under the 1909 Act, statutory damages were available for "each infringement that was separate." Id. at 1102; see L.A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 105-06, 39 S.Ct. 194, 195-96, 63 L.Ed. 499 (1919). The current statute shifts the unit of damages inquiry from number of infringements to number of works. Stigwood may retain some relevance under the 1976 Act in its recognition that three songs performed in the musical would support separate statutory damages awards, but that three "overlapping copyrights on substantial parts of the entire work" would support only a single award, Stigwood, 530 F.2d at 1104 (emphasis in original). The three copyrights thought to be "overlapping" were identified as covering "Musical Excerpts Complete Libretto," "Libretto," and "Vocal Score." Id.
 
 
 51
 The eight teleplays for "Twin Peaks" represent a current television genre in which one or more plots continue from one episode to another. The style was popularized by the police series "Hill Street Blues" and is still in vogue in the lawyers series "L.A. Law." "Twin Peaks" carried the style to its limit by keeping the point of the basic plot (Who killed Laura?) continuing throughout the first season of the series, beyond the eight episodes at issue in this litigation. Whatever the scope of the Stigwood ruling concerning "overlapping" copyrights in related components of a single musical production might be under the 1976 Act, we think it has no application to separately written teleplays prepared to become episodes of a weekly television series. The author of eight scripts for eight television episodes is not limited to one award of statutory damages just because he or she can continue the plot line from one episode to the next and hold the viewers' interest without furnishing a resolution. We might well have a different situation if a book written as a single work was then adapted for television as a group of episodes, for example, the six-part television adaptations of John LeCarre's "Tinker, Tailor, Soldier, Spy" and "Smiley's People." Even in such circumstances, though there would be but one book infringed, there might be separate awards for infringement of each televised episode. In any event, ours is the easy case of infringement of eight separate works that warrants eight statutory awards, whether the registrations apply to the teleplays or the televised episodes.
 
 
 52
 PIL's reliance on Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 221 U.S.P.Q. 114, 1983 Copyright L. Dec. (CCH) p 25,572 (C.D.Cal.1983), is unavailing. Though the plaintiff sought multiple statutory awards for infringement of seven copyrights, the District Court ruled that what the defendant had infringed was the expression of a single idea, the characters and locale; the fact that the characters and the locale appeared in successive television episodes did not warrant multiple awards. Here, by contrast, what has been infringed by the detailed copying of plots are the copyrights in the separately written and copyrighted teleplays or programs.
 
 
 53
 2. Willfulness. With respect to statutory damages, PIL claims that the District Court's finding of willful copyright infringement was clearly erroneous. The result of the finding of willfulness was to increase the maximum amount of statutory damages awardable for each copyright violation from $20,000 to $100,000. See 17 U.S.C. § 504(c)(2). Though the District Court's award of $15,000 for each work infringed is sustainable with or without a finding of willfulness, we feel obliged to review the challenge to the willfulness finding because it may well have influenced both the amount of the award and the appropriateness of awarding attorney's fees. See Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 78 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).
 
 
 54
 PIL concedes that it knew of the copyrights, and continued publication after receiving a specific warning, but contends that it believed in good faith that its actions were lawful. Much of the evidence of willfulness took the form of disputed accounts of the resolution of previous copyright suits involving PIL. PIL apparently contended in the District Court that this evidence was inadmissible, but has not pursued this claim on appeal. PIL's counsel also testified that he had reviewed the manuscript of the Book and believed that it was fair use, although he had not prepared a written opinion to this effect. TPP developed some of its most damaging evidence through cross-examination of defendant Louis N. Weber, PIL's president. Weber testified that as a book publisher, he "hadn't thought about a TV show being copyrighted." The District Court explicitly found this testimony incredible in light of PIL's substantial litigation history and ruled that PIL "was happy to go as far as they thought they could to use other's copyrighted material with the view that they could ultimately settle for some minor sanction."
 
 
 55
 We review the District Court's determination of willfulness for clear error, see Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir.1986), with particular deference to determinations regarding witness credibility, see Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility. See Fitzgerald Publishing Co., 807 F.2d at 1115. The District Court rejected PIL's alternate contentions that it had not thought of copyright infringement or had thought the work was within the fair use exception. We cannot say that that determination was clear error.
 
 
 56
 3. Apportionment of profits. Though TPP's election of statutory damages against PIL moots all appellate issues concerning the calculation of actual damages and profits with respect to PIL, the appellants' claim that profits should have been apportioned between infringing and non-infringing components of the Book remains viable with respect to the award of profits of defendants Penguin USA, Inc. and Scott Knickelbine. It is true that "where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment." Orgel v. Clark Boardman Co., 301 F.2d 119, 121 (2d Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962). However, the burden was on PIL to present evidence suggesting a rational division, and we review the decision of the District Court that the defendants did not carry this burden only for clear error. See Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 407 (2d Cir.1989). As in Business Trends Analysts, the District Court could find that the " 'heavily infringed' portions were the sections of [the copyrighted works] 'that gave them their value,' " and that the " 'infringed portions are so suffused and intertwined with non-infringing portions as to render [an apportionment] impossible.' " 887 F.2d at 407 (quoting Business Trends Analysts, Inc. v. Freedonia Group, Inc., 700 F.Supp. 1213, 1241 (S.D.N.Y.1988)).
 
 IV. Attorney's Fees
 A. District Court award of attorney's fees
 
 57
 PIL contends that the District Court abused its discretion in awarding substantial attorney's fees to TPP for both the New York and Illinois actions. PIL claims that TPP did not qualify as a prevailing party in the Illinois action, and that in the New York action, damages should be apportioned, with reductions for the amount of attorney's fees devoted to the trademark claim and the portions of the Book that were not infringing. PIL also contends without elaboration that there was some amount of duplicative billing, but this claim appears not to have been presented in the District Court.
 
 
 58
 As to the copyright attorney's fees, we review only for abuse of discretion. See N.A.S. Import, Corp. v. Chenson Enterprises, Inc., 968 F.2d 250, 253 (2d Cir.1992). The standard for awarding fees is very favorable to prevailing parties; indeed, " 'fees are generally awarded to a prevailing plaintiff.' " Id. at 254 (quoting Roth v. Pritikin, 787 F.2d 54, 57 (2d Cir.1986)). While we agree with PIL that the award of fees for the Illinois action is somewhat unusual, we find that it was proper. Had TPP interposed its copyright claims by way of a counterclaim in a single action, it would have been allowed recovery of all fees. See Rose v. Bourne, Inc., 279 F.2d 79, 81 (2d Cir.), cert. denied, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). TPP's decision to seek dismissal of the Illinois action on jurisdictional grounds and to bring the action in New York can be seen as part of a unified course of action of vindicating its copyrights. We find no abuse of discretion in the District Court's decision to award copyright fees for both lawsuits.
 
 
 59
 The trademark attorney's fees, however, stand on a different ground. The relevant statute, 15 U.S.C. § 1117 (1988), allows recovery of a reasonable attorney's fee only in "exceptional cases." Such fees should be awarded only "on evidence of fraud or bad faith." See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). While a finding of bad faith and a decision to award trademark fees is ordinarily reviewed only for abuse of discretion, see George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1542-43 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992), it appears that the District Court failed to apply the proper statutory standard. Even apart from our decision to vacate the District Court's finding of trademark infringement, we see little evidence of "fraud or bad faith" here concerning the alleged trademark infringement. Accordingly, we vacate the award of attorney's fees to the extent that the fees related to TPP's prosecution of the trademark claim. On remand, if the trademark claim is pursued and results in a determination of liability for trademark infringement, the District Court must further determine whether the infringement satisfies the standard of section 1117. Unless the District Court adheres to its decision to award attorney's fees on the trademark claim, an appropriate apportionment of fees will be required.
 
 B. Attorney's fees on appeal
 
 60
 Relying both on 17 U.S.C. § 505 (1988) and Fed.R.App.P. 38, TPP contends that it is entitled to recover the fees it expended in defending this appeal. We reject the request for fees premised on Rule 38, which allows fees and double costs to be awarded for the bringing of a frivolous appeal. While some of PIL's arguments tread close to the line, the majority of the arguments made by PIL are substantial, and one is meritorious.
 
 
 61
 In the circumstances of this case, we also decline to award appellate fees under section 505 of the Copyright Act. It is true that the prevailing party in a copyright action is ordinarily entitled to fees at the trial level, and that "an award of attorney's fees may be made for services rendered on appeal as well as at the trial level," 3 Nimmer § 14.10[E], at 14-129. However, a very substantial fee (even if ultimately reduced somewhat to omit fees for prosecution of the trademark claim) was awarded at the trial level, and the lawyers in this appeal were familiar with the issues because they made similar arguments in the District Court. See Russell v. Price, 612 F.2d 1123, 1132 (9th Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). Exercising our discretion, we decline to assess further attorney's fees against either party.
 
 Conclusion
 
 62
 We affirm the District Court's decision as to copyright liability, vacate the District Court's decision as to trademark liability, affirm the award of statutory damages, and vacate the award of attorney's fees.[7] The matter is remanded for further proceedings consistent with this opinion. Full costs to plaintiff-appellee.
 
 
 
 *
 The Honorable Gregory W. Carman, sitting by designation
 
 
 [1]
 Professor Nimmer has argued that doctrinal clarity would be served by separating the copying and substantial similarity inquiries. He contends, endorsing Professor Latman's approach, that the copyright holder should first be required to show copying, either by direct evidence of copying or by the combination of access and "probative similarity." Once copying is shown, the copyright holder would still have to prove substantial similarity to establish infringement. See 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B], at 13-11 to 13-12 (1992). Since a showing of substantial similarity will necessarily include the lesser showing of probative similarity, there seems little harm in combining the copying and infringement inquiries, as we have done in the past. See, e.g., Warner Bros., Inc. v. American Broadcasting Companies, Inc., 720 F.2d 231, 239-43 (2d Cir.1983)
 
 
 [2]
 In the bucolic Northwest lumber town of Twin Peaks, Pete Martell discovers a body on the riverfront outside the Packard Mill. He calls Sheriff Truman ... "She's dead, wrapped in plastic," he sputters. Truman, Deputy Andy, and Doc Hayward go to inspect the body, which they discover to be that of Laura Palmer--the most popular girl in town. The body is wrapped in plastic sheeting and wound in white tape
 FBI Special Agent Dale Cooper drives into town, primly dressed in a dark suit and tie and dictating the minutiae of his travels to his secretary, Diane, into a microcassette recorder. When he meets Sheriff Truman--Harry S. Truman, that is--he immediately questions Truman about the local trees, beginning his preoccupation with the local flora and fauna.
 Back at the station house, Cooper springs open Laura's diary and finds two significant entries (which he is careful to record for Diane): the last, dated February 23, which reads "nervous about meeting J tonight," and one 18 days earlier, which includes an envelope containing a safety deposit box key and white powder, and reads simply, "Day One." Cooper speculates that the white powder is cocaine, but Harry can't believe it. Laura?
 Armed with Laura's mysterious videotape, Cooper questions suspects Bobby and Donna about a scene in the tape that shows Laura and Donna cavorting at a picnic. This is our first view of the murdered girl alive. As she brings her face close to the camera, we see a blonde girl with a knowing smile. The scene on the tape ends with a close-up of Laura's eye. The reflection of a motorcycle's headlights can be seen in her eye.
 Cooper and Harry Truman go to an abandoned rail car, which appears to be the place where Laura and Ronette were tortured. They find a strange mound of dirt, and on top of it is a necklace with half of a golden heart dangling from it. Nearby is a scrap of paper on which is written--apparently in blood--the cryptic message, "Fire walk with me." Next, we see James Hurley, his motorbike by his side, sitting and looking out toward the mountains. He is holding the other half of the heart.
 Later, in Laura's safety deposit box, Cooper discovers $10,000 in cash and a copy of Flesh World magazine. In the magazine, he finds personal ads from Ronette Pulaski and Leo Johnson--Leo's ad featuring a photo of his truck identical to the shot of his truck in the scene with Bobby and Shelly.
 Detailed as these excerpts are, they form less than half of the summary of the first episode.
 
 
 [3]
 The four factors are:
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 (2) the nature of the copyrighted work;
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
 17 U.S.C. § 107 (1988).
 
 
 [4]
 The TWIN PEAKS mark is at least suggestive and not merely descriptive. TWIN PEAKS neither literally describes the television program nor describes the purpose or utility of the product. See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1040 (2d Cir.1992). Rather, the term "requires imagination, thought and perception to reach a conclusion as to the nature of goods." Id. (quoting Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 (2d Cir.1976)). Ordinarily a suggestive mark is entitled to protection without any showing of secondary meaning because it is inherently distinctive. Abercrombie & Fitch Co., 537 F.2d at 11; see also Restatement (Third) of Unfair Competition § 13 (Tent. Draft No. 2, 1990). However, we have applied a more stringent rule to literary titles, see Rogers v. Grimaldi, 875 F.2d 994, 998 (2d Cir.1989); see also Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V., 749 F.Supp. 1243, 1252-53 (S.D.N.Y.1990); Orion Pictures Co. v. Dell Publishing Co., 471 F.Supp. 392, 395 (S.D.N.Y.1979), in requiring the trademark proprietor to demonstrate secondary meaning notwithstanding the suggestive nature of the title. But see Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc., 886 F.2d 490, 494-95 (2d Cir.1989) (analyzing a Lanham Act claim concerning the title "Cliffs Notes" without any discussion of secondary meaning)
 
 
 [5]
 There can be no claim here that the Book misleads consumers into believing that it is about Twin Peaks. The Book is avowedly about Twin Peaks. Cf. Rogers v. Grimaldi, 875 F.2d at 1001 (analyzing claim that film depicting fictional characters misled consumers into believing it was about Ginger Rogers)
 
 
 [6]
 We observe that while the judgment enjoined PIL from "[u]sing the title 'Welcome to Twin Peaks,' or using the mark TWIN PEAKS, or any other indicia of the 'Twin Peaks' program, in any manner likely to cause confusion," no damages were awarded against PIL on the basis of the trademark violation. Because we uphold the District Court's injunction against publication of the Book, the significance of our decision to vacate the injunction against use of the trademark is limited. Even if, on remand, the District Court should find the likelihood of confusion not established to a degree sufficient to outweigh the First Amendment interest in the creative use of literary titles, the consequence would be only that PIL may publish a different book under the same title, and even that course of action may render PIL liable to Simon & Schuster under the settlement agreement entered in the Illinois litigation
 
 
 [7]
 We thus affirm provisions 1(a), 3, 4, 5(a), 5(b), 5(c), 7, and 8 of the judgment, and vacate provisions 1(b) and 6. Provision 2 is vacated to the extent it applies to materials that violate only the trademark TWIN PEAKS, and otherwise affirmed