**INFINITY BROADCASTING CORPORATION,**
**Plaintiff,**

v.

**Wayne KIRKWOOD d/b/a MEDIA DIAL–UP, Defendant.**

**No. 96 Civ. 0885 LAK.**

United States District Court,
S.D. New York.

June 6, 1997.

Bruce P. Keller, Debevoise & Plimpton, New York City, for Plaintiff.

Wayne Kirkwood, pro se.

## OPINION

KAPLAN, District Judge.

This is a copyright infringement case. Plaintiff Infinity Broadcasting Corporation ("Infinity") owns and operates radio stations and claims copyright protection for all of its broadcasts. Defendant Wayne Kirkwood d/b/a Media Dial–Up operates "listen lines" through which subscribers can listen to radio broadcasts, including Infinity broadcasts, over the telephone. The service is marketed to radio stations, radio consultants, advertisers, performance rights organizations and others in the advertising and entertainment industries. Infinity seeks an injunction restraining Kirkwood from retransmitting the copyrighted material broadcast by its stations as well as statutory damages, costs, and fees. Kirkwood contends that his activities are protected by the fair use and carrier provisions of the Copyright Act, 17 U.S.C. §§ 107, 111(a)(3).

### Facts

#### The Parties

Infinity, a Delaware corporation headquartered in New York, owns and operates one of the largest radio networks in the United States. It owns radio stations in the nation's largest media markets and syndicates a number of popular programs including "Imus in the Morning," the G. Gordon Liddy show, and "Ferrall on the Bench." It claims copyright protection for all of its broadcasts and syndicated programs.

Kirkwood is a citizen of Texas. He does business for profit under the name Dial–Up Media.

#### Kirkwood's Service

Kirkwood has placed radio receivers in America's ten largest radio markets. Each receiver is plugged into an electrical outlet and connected to telephone lines. Dial–Up subscribers pay Kirkwood a fee in exchange for a list of confidential telephone numbers that enables them to access the equipment. The equipment allows the subscriber to select from among all of the signals pulled in by a given receiver the particular signal or signals to which the subscriber wishes to listen by giving commands through a telephone keypad. The subscriber thus is able to dial the "listen line" for a given city and hear real-time retransmissions of radio broadcasts from that city. The retransmissions are unaltered except for audio quality degradation.

Subscribers use the Kirkwood service for such purposes as auditioning on-air talent, verifying the broadcast of commercials, and listening to a station's programming format and feel. Kirkwood's service is not the only means by which the relevant audience may accomplish those objectives. One located in the same media market as the station he or she wishes to monitor of course may turn on the radio and listen. Many stations, including some Infinity stations, provide listen lines for the use of some advertisers and other clients and friends, permitting those with access to listen to broadcasts from remote locations. Some organizations, particularly performance rights organizations such as AS-CAP, hire freelance tapers who make "air-check" tapes of particular programs in distant markets. Some radio stations are available in distant markets via the Internet.

### The Specific Broadcasts at Issue

Infinity appears to have chosen three broadcasts for the purpose of framing this as a test case. On October 18, 1996, three days before it served its amended complaint, Infinity registered with the Copyright Office three programs that were aired on Infinity stations in New York and Los Angeles on October 8, 1996. Each of the three programs was accessed by a Dial–Up user at Infinity's request over Kirkwood's listen lines.

Infinity granted Kirkwood no right to retransmit, perform or otherwise make available the October 8 broadcasts. Kirkwood has not compensated Infinity for the use of those or any other broadcasts. Infinity has demanded that Kirkwood cease and desist from retransmission of its broadcasts.

\* \* \*

Both parties moved for summary judgment. The parties then entered into a stipulation providing for the non-jury trial of this action without the taking of live testimony on a record consisting of the summary judgment submissions, the stipulated facts contained in the joint pretrial order, and certain additional factual submissions. (Stipulation and order, Jan. 30, 1997) This constitutes the Court's decision after trial.

### Discussion

### Kirkwood's Retransmissions and Infinity's Exclusive Rights

It is virtually undisputed that Infinity holds the copyright in the three October 8, 1996 broadcasts and that its programming is copyrightable.[1] Kirkwood's only suggestion to the contrary rests on the fact that Infinity's programming (such as music played on music stations) may include works separately copyrighted by others. This is entirely without significance, as the Act specifically provides for such "compilation" copyrights. See 17 U.S.C. § 101. Nor does Kirkwood deny that Infinity has the exclusive right to perform the copyrighted material, i.e., its own copyrighted broadcasts, publicly and that Kirkwood's actions constitute public performance.[2] In consequence, Kirkwood is guilty of infringement unless his actions are protected by either the fair use or the carrier defenses set out in Sections 107 and 111(a)(3) of the Act, respectively.

### Fair Use

Section 107 of the Copyright Act, 17 U.S.C. § 107, codifies the defense[3] of fair use. One may use and reproduce a copy-

---

**1.** Under Section 102 of the Act, 17 U.S.C. § 102, a work is copyrightable if it is fixed in a tangible form, is an original work of authorship, and comes within the subject matter of copyright. A radio program is "fixed in a tangible form" if it is recorded simultaneously with its transmission. *Trenton v. Infinity Broadcasting Corp.*, 865 F.Supp. 1416, 1423 (C.D.Cal.1994); Notes of Committee on the Judiciary, H.R.REP. No. 94–1476 *reprinted in* 17 U.S.C.A. § 102, historical note, at 48–49 (West 1995). It is undisputed that the October 8, 1996 broadcasts were so recorded.

**2.** *Broadcast Music, Inc. v. Claire's Boutiques, Inc.* 949 F.2d 1482, 1486–88 (7th Cir.1991), *cert. denied* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 547 (1992) (playing radios in stores constituted "public performance" of copyrighted broadcasts).

**3.** The burden of proving fair use lies with the defendant. *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir.1994), *cert. dismissed,* ——— U.S. ———, 116 S.Ct. 592, 133 L.Ed.2d 486 (1995); *see Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 589–91, 114 S.Ct. 1164, 1177, 127 L.Ed.2d 500 (1994).

righted work "for purposes such as criticism, comment, news reporting, teaching ...., scholarship, or research" provided the use is a fair one. The factors to be considered in determining the fairness of the use include "(1) the purpose and character of the use. including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

■ To begin with, Kirkwood's use falls within the realm "for which a protected fair use may be made." [4] The purposes enumerated in the opening words of Section 107 are non-exclusive illustrations of particular uses which, in appropriate cases, may be covered by the defense.[5] While Kirkwood's service is not criticism, comment, teaching or scholarship—and its claim to constituting news reporting or research is slim—a court may not decline to analyze a proffered fair use defense under the four statutory and any other relevant factors on the ground that the use in question does not fall within the preamble to Section 107.[6] The Court therefore proceeds to those matters.

*Purpose and Character*

The first of the statutory factors focuses on the purpose and character of Kirkwood's use of the Infinity broadcasts. Infinity argues that this consideration cuts in its favor because Kirkwood retransmits Infinity's programs for commercial purposes as, indeed, Kirkwood has stipulated.[7] Kirkwood rejoins that he never has turned a profit doing so and that his actions serve to keep Infinity

(and other broadcasters) honest by affording a means for advertisers to insure that they get the air time for which they pay and fill the need of a specialized audience for information about the actual sound and feel of Infinity's broadcasts that they otherwise could not readily hear.

Kirkwood's actual profit and loss experience is utterly irrelevant to the analysis. He does not claim an eleemosynary motive, and the Court in any case finds that his predominant purpose is to make a profit. That he seeks profit, however, does not "preclude[ ] a finding that his particular use of a prior author's protected expression serves a purpose that weighs favorably on the fair use scales." [8] Moreover, Kirkwood's service merely enables its subscribers to overcome the barriers of distance to hear broadcasts "which [they] had been invited to witness in [their] entirety free of charge." [9] Hence, the first of the fair use factors turns to a much greater extent on other considerations.

As the Supreme Court recently instructed:

"The central purpose of this investigation [of the nature and purpose of the accused use] is to see, in Justice Story's words, whether the new work 'merely supersede[s] the objects' of the original creation, *Folsom v. Marsh*, [9 F.Cas. 342, 348 (No. 4.902) (C.C.Mass.1841) ]; accord, *Harper & Row [v. Nation Enterprises]*, *supra*, 471 U.S. [539] at 562, 105 S.Ct. [2218] at 2231 [85 L.Ed.2d 588 (1985)] ('supplanting' the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other

---

4.  *Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1374 (2d Cir. 1993).

5.  *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230–31, 85 L.Ed.2d 588 (1985); *Twin Peaks*, 996 F.2d at 1373–74; *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

6.  *Pacific & S. Co. v. Duncan*, 744 F.2d 1490, 1494–95 (11th Cir.1984), *cert. denied*, 471 U.S.

1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985); 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05[A][1][a], at 13–158 to 13–159 (1996) (hereinafter NIMMER).

7.  Pretrial order, § 10.

8.  *Twin Peaks*, 996 F.2d at 1374.

9.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984).

words, whether and to what extent the new work is 'transformative.'"[10]

Kirkwood's retransmissions leave the character of the original broadcasts unchanged. There is neither new expression, new meaning nor new message. Kirkwood simply uses new technological means to retransmit the original to a different audience in a manner quite analogous, from a technological standpoint, to one who uses a photocopier to reproduce a book for the purpose of distributing copies to persons who lack copies of the edition published by or on behalf of the copyright owner. The nature of Kirkwood's retransmissions, however, is not the only consideration pertinent to the first factor.

Infinity's purpose in creating the copyrighted programs is entertainment, the amassing of audiences, and thereby the generation of advertising and syndication revenues. Kirkwood's service is quite different. Although it broadens the dissemination of Infinity's material, it does so only to a limited audience with quite specialized objects in mind. An advertiser based in New York who has a commercial scheduled to air in Dallas at a particular time, for example, can use Kirkwood's service to verify the broadcast of the commercial by listening at the appointed hour to the Dallas station on which it is to be aired without having an agent within the range of the Dallas broadcast signal. A New York station manager may audition a Chicago radio personality whom she may wish to hire without either journeying to Chicago or relying on an audition tape.

Kirkwood's object is significant. He is not, to paraphrase Justice Story, merely superseding the objects of the original broadcasts.[11] He is using those broadcasts for a quite different purpose.

Taking into consideration not only the nature of Kirkwood's retransmissions, but their limited and different purpose, the Court concludes that the first of the fair use factors cuts to some extent in Kirkwood's direction.

*Nature of the Copyrighted Work*

In considering the nature of the copyrighted work, the focus is on the creativity of the plaintiff's work. The closer the copyrighted work comes to the core purposes of copyright protection—in other words, the more creative the work—the narrower the scope of uses properly characterized as fair. It follows, therefore, that works that merely reflect diligence in compilation. or that were intended purely for private use, may afford greater scope for fair use.[12]

Portions of Infinity's copyrighted programs such as the "patter" and other remarks of its announcers are original works. Other portions, such as the airing of recordings of music protected by other copyrights or that already are in the public domain, are not. The compilation of these and other elements to make the allegedly infringed works is both unique and creative, thus advancing Infinity's claim.[13]

*The Amount and Substantiality of Use*

The facts concerning the amount and substantiality of Kirkwood's use of Infinity's programming are undisputed. The parties nevertheless are on opposite sides of a broad chasm with respect to the appropriate characterization of those facts.

It is undisputed that a Kirkwood subscriber wishing to do so could dial up Kirkwood's equipment in a distant city and monitor Infinity's programming continuously. Thus,

**10.** *Campbell*, 510 U.S. at 578–80, 114 S.Ct. at 1171 (quoting Leval, *Toward A Fair Use Standard*, 103 Harv.L.Rev. 1105, 1111 (1990) (hereinafter Leval)); *accord, American Geophysical Union*, 60 F.3d at 923.

**11.** *Folsom*, 9 F.Cas. at 348.

**12.** *See Harper & Row*, 471 U.S. at 563–64, 105 S.Ct. at 2232–33; *New Era Publications International, ApS v. Carol Publishing Group*, 904 F.2d 152, 157 (2d Cir.1990), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251, 3 Nimmer §§ 13.05[A][2][a], [b].

**13.** One of the allegedly infringed programs, the October 8, 1996 Mike Francesca and Christopher Russo Show as broadcast on WFAN–FM in New York, illustrates the point. The program, better known to New York area sports aficionados as "Mike and the Mad Dog," includes extemporaneous commentary on current sports news by Francesca and Russo and telephone comments by listeners, among other elements. There is no doubt that the program is unique and, while devotees of the arts perhaps would dispute the point, creative, at least in the sense relevant to copyright law.

Kirkwood's activities, as a matter of technological possibility, permit the "copying" of the entirety of Infinity's programs in those cities in which Kirkwood has monitoring installations.

There is only limited evidence concerning the extent to which Infinity subscribers actually use Kirkwood's service in general. Certainly some of the uses to which the service is put appear to involve only very brief monitoring, e.g., verifying that advertisements are broadcast as scheduled.[14] Others, however, appear to involve significantly more extensive monitoring. A performance rights organization, for example, uses the service to monitor radio station broadcasts for unlicensed use of copyrighted material owned by the artists, composers and publishers it represents.[15] And it is logical to infer that an industry executive using the service to consider hiring on-air talent or to evaluate a radio station for purchase, which are among the purposes for which the service is offered,[16] would listen for significant periods of time. But there is no data in the record concerning the actual extent of usage, either in general or with respect to the three copyrighted programs that are the focus of the case.

As a general matter, the more of the copyrighted work that is taken, the weaker the fair use defense. But the test is not purely quantitative, as illustrated by the Supreme Court's decisions in *Harper & Row*[17] and *Sony*.[18] In the former case, the Court held that the copying of 300 to 400 words from a lengthy book was not a fair use, despite its quantitatively *de minimis* extent, because the defendant had taken the heart of former President Ford's memoirs. The importance of the copied portion in the overall context of the copyrighted work therefore plays a significant role. In *Sony*, on the other hand, the Court upheld as fair use the in-home taping of the entirety of copyrighted motion pictures broadcast via television. thus demonstrating that other considerations in a rare

case may overcome even a taking of the entirety.

What then is to be made of the third statutory factor? There is a virtually complete absence of proof concerning the extent to which the three copyrighted programs at issue were retransmitted by Kirkwood's service although, of course, it is possible that all three programs were retransmitted in their entirety. If the third statutory factor properly depends only on the extent of actual retransmission, the Court would conclude that this consideration is essentially neutral. Kirkwood certainly did not prove that the retransmission was neither quantitatively nor qualitatively substantial. On the other hand, there is no evidence that so much was retransmitted as to cut materially in Infinity's favor. Given the unusual nature of Kirkwood's service, however, the Court doubts that a narrow focus on the precise proportions, or the relative significance of the specific fractions, of the copyrighted programs that were retransmitted, to the exclusion of the potential, is the appropriate frame of reference.

Kirkwood offered his subscribers the ability to monitor whatever portions of the copyrighted programs they wished. Indeed, he promoted his endeavor as a seven-day-a-week, 24 hour-a-day service. The determination of the amounts and the particular segments monitored was up to the subscribers. It stands to reason, moreover, that the more successful Kirkwood becomes in selling his service to interested parties, the more likely it is that any given broadcast will be retransmitted. By the same reasoning, the more successful the service, the more likely that a subscriber, or the collective action of a plurality of subscribers, will cause Kirkwood to retransmit most or all of a given program.

In construing the fair use defense, it is important to bear in mind the purpose of the Copyright Clause of the Constitution. "The rights conferred by copyright are designed to

---

**14.** *See* Kirkwood Aff., Dec. 13, 1996, ¶ 15.

**15.** *Id.*, ¶ 21.

**16.** Defendant's statement of material facts, Dec. 13, 1996, ¶ 21.

**17.** *Harper & Row, Publishers, Inc.*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588.

**18.** *Sony*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574.

assure contributors to the store of knowledge a fair return for their labors." [19] They are "intended to motivate the creative activity of authors ... by the provision of a special reward, and to allow the public access to the products of [the author's] genius after the limited period of exclusive control has expired." [20]

These considerations suggest that the relevant focus in assessing the fairness of an infringing use which affords third parties, at their discretion, the ability to hear the entirety of copyrighted broadcasts is the potential rather than the actual use by the third parties. The third statutory fair use factor implicitly presupposes that potential authors or, in this case, broadcasters tacitly weigh the costs in time, effort and treasure of creating copyrighted products against the possible or likely rewards. As the anticipated rewards logically would be related in these unusual circumstances to the potential for future retransmission, as distinguished from an after-the-fact assessment of the extent to which retransmission actually occurred in a given instance, it is Kirkwood's offering of the entirety of the broadcasts that is important. This makes the third factor cut in favor of Infinity.

*Effect on Potential Market for Copyrighted Work*

The policy of the Copyright Clause informs also the consideration of the fourth statutory factor. The likely impact of the alleged infringement on the economic return to the copyright holder is of obvious importance to the question whether the defendant's use is a fair one.[21]

The proper focus of the fourth factor is on "the ability of the defendant's use to substitute for the plaintiff's work in the marketplace or from its failure to pay a prescribed license fee ..." [22] As the Second Circuit has put it, "The fourth factor is aimed at the copier who attempts to usurp the demand for the original work." [23] Moreover, "[t]his factor ... poses the issue of whether unrestricted and widespread conduct of the sort engaged in by the defendant (whether in fact engaged in by the defendant or by others) would result in a substantially adverse impact on the potential market for, or value of, the plaintiff's present work." [24]

The principal value of Infinity's copyrighted programs lies in the ability to attract listeners. There are essentially two means of capitalizing on a successful show by doing so. First, Infinity can retransmit the show on stations that it owns, thereby extending its reach to other media markets, increasing the overall audience, and generating more advertising revenue. Second, Infinity may grant non-owned stations the right to retransmit in exchange for compensation.[25] The impact of unauthorized retransmission depends on whether the retransmission would be likely to diminish the attractiveness of the Infinity program to advertisers or non-owned stations.

In this case, the parties have stipulated that Kirkwood's service is not intended for the general public. Rather, it has been mar-

19. *Harper & Row, Publishers, Inc.*, 471 U.S. at 546, 105 S.Ct. at 2223 (citing *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043–44, 45 L.Ed.2d 84 (1975)).

20. *Sony*, 464 U.S. at 429, 104 S.Ct. at 782.

21. In *Harper & Row*, the Supreme Court said that this factor is "undoubtedly the single most important element of fair use." 471 U.S. at 566, 105 S.Ct. at 2233. In *American Geophysical Union v. Texaco, Inc.*, 37 F.3d 881 (2d Cir.1994), however, the Court of Appeals inferred from the Supreme Court's failure to reiterate this characterization of the economic impact factor in *Campbell*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500, that the Court has "abandon[ed] the idea that any factor enjoys primacy" in the fair use analysis. 37 F.3d at 894. *Accord*, 1

WILLIAM F. PATRY, COPYRIGHT LAW AND PRACTICE 77–80 (1994) (hereinafter PATRY). This Court would reach the same result in this case irrespective of whether the fourth statutory factor is "the single most important element" or merely one of several elements to be considered in evaluating Kirkwood's fair use defense.

22. 1 PATRY 775–76.

23. *Consumers Union of the United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

24. 3 NIMMER § 1305[A][4], at 13–187.

25. Suleman Decl. ¶¶ 5–7.

keted to radio stations, consultants, advertisers. performance rights organizations and others in the advertising and entertainment industries.[26] There is no suggestion that any of the subscribers has rebroadcast copyrighted Infinity material to the public. In consequence, Kirkwood's service, the Court finds, has had no impact on the value of Infinity's copyrighted programs as a means of generating advertising or syndication revenue.[27]

There is another possible economic impact of Kirkwood's service on Infinity to be considered. As a theoretical matter, Infinity has the right to grant licenses to Kirkwood and others wishing to make available the service Kirkwood provides. A conclusion that Kirkwood's activities constitute a fair use would deprive Infinity of that potential revenue stream and thus affect the value of its copyrighted programs.[28] But the bare theoretical possibility that the copyright holder might obtain revenue by licensing uses such as that engaged in by the defendant is insufficient to defeat the fair use defense. "[O]nly traditional, reasonable, or likely to be developed markets" for such licensing is relevant.[29]

In this case, there is no evidence that Infinity or any other broadcaster licenses or has attempted to license the retransmission of its copyrighted programming for purposes such as Kirkwood's.[30] There is no suggestion that any intends to do so or, for that matter, that Infinity even demanded payment from Kirkwood as a condition of permitting him to continue his activities. While it is far from clear how a trial court should assess the question whether a given potential for licensing is "traditional, reasonable, or likely to be developed,"[31] there is no need to probe the outer limits of this newly developing doctrine.

■ The ultimate question, so far as the fourth statutory factor is concerned, is whether defendant's use is likely to have a substantial adverse economic impact on the value of the copyrighted work. Kirkwood's service is directed to a narrow and specialized audience. It is an audience that has alternative means for accomplishing the objectives served by the service. The prices Kirkwood charges are modest, and the service has met with quite limited success. It is safe to say, therefore, that the potential revenues to be derived by licensing the copyrighted works to Kirkwood-type operations are extremely modest when compared to the revenues to be derived from the sale of radio advertising in or syndication rights for major media markets.

Taking these considerations together, the Court finds that the use made by Kirkwood of Infinity's programs have had, and are likely to have, no material effect on the value of the copyrighted material. The fourth factor thus weighs strongly in favor of Kirkwood.

*Aggregate Assessment*

One of the statutory factors clearly weighs in Infinity's favor. The copyrighted works are not factual; they are creative because some of the material, as well as the manner in which Infinity combines that material with other copyrighted program content, is original. The nature and purpose and the

---

**26.** Pretrial order, ¶ 17.

**27.** Infinity argues that retransmission of its programs to distant markets damages its ability to exploit the copyrighted works in those markets, relying on H.R.Rep. No. 1476, 94th Cong., 2d Sess. 90 (1976), U.S.Code Cong. & Admin. News, 1976, 5659. The argument misses the mark because Kirkwood's retransmissions, unlike those considered in the House Report, were not disseminated to the general public, leaving intact Infinity's ability to generate revenue from broad dissemination in remote markets.

**28.** *See American Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 929 n. 17; LEVAL, 103 HARV. L.REV. at 1124–25.

**29.** *American Geophysical Union, v. Texaco, Inc.,* 60 F.3d at 930, *accord, Campbell,* 510 U.S. at 591–93, 114 S.Ct. at 1178.

**30.** Infinity took pains to describe its program syndication activities and to note that they contribute a meaningful portion of its total revenues but was silent on the point here at issue. Suleman 5–7.

**31.** *See* 3 NIMMER § 13.05[A][4], at 13–189 to 13–193.

amount and substantiality of Kirkwood's use fall in the center of the spectrum, with the former cutting somewhat in Kirkwood's favor and the latter against him. The economic impact factor strongly favors Kirkwood. The Court perceives no other considerations bearing on the analysis that have not been taken into account under the four statutory headings.

The Supreme Court in *Campbell* made clear that fair use determinations are not governed by "bright-line rules." The doctrine "calls for case-by-case analysis" in which all of the relevant factors are to be explored "in light of the purposes of copyright." [32] This Court ultimately is persuaded that Kirkwood's service, given the audience to which it has been sold and the purposes for which it has been offered and to which it has been put, did nothing to diminish the incentive of Infinity or of broadcasters in general to create original programming or their ability to gain a fair return on their endeavors. Nor did Kirkwood use the copyrighted programs for the same purpose as the copyright holder. The Court therefore finds that Kirkwood's use of the three copyrighted programs were fair ones.[33] In view of this finding, there is no need to address Kirkwood's carrier defense.

### Conclusion

As Kirkwood has established his fair use defense to the claim of infringement of Infinity's three copyrighted programs, the action is dismissed.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

---

**32.** 510 U.S. at 576–80, 114 S.Ct. at 1170–71.

**33.** This conclusion is consistent with the functional analysis espoused by the Nimmers, which focuses on whether the copyrighted and the accused works perform the same or different functions. 3 NIMMER § 13.05[B][1]. The purpose of Infinity's programming is to entertain and attract wide audiences in order to sell advertising, a purpose quite different from that served by Kirkwood's service.