INFINITY BROADCASTING
CORPORATION,
Plaintiff,

v.

Wayne KIRKWOOD d/b/a Media
Dial–Up, Defendant.

No. 96 Civ. 0885 (LAK).

United States District Court,
S.D. New York.

Sept. 8, 1999.

Bruce P. Keller, Jeremy Feigelson, Debevoise & Plimpton, New York City, for plaintiff.

Wayne Kirkwood, pro se.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The issue before the Court is whether the passive carrier exemption provided by Section 111(a)(3) of the Copyright Act of 1976 [1] protects defendant, which operates a dial-up "listen line" service for monitoring copyrighted radio broadcasts in locations remote from that of the caller, from liability for copyright infringement.

---

1. 17 U.S.C. § 111(a)(3).

## I

This case again is before the Court on remand, and the facts are detailed in the prior opinions.[2] They are summarized and supplemented here only to the extent necessary to decide the issue now before the Court.

The plaintiff, Infinity Broadcasting Corporation ("Infinity"), is a large media company that owns and operates radio stations across the country[3] and claims copyright in all of the programs broadcast on its stations.[4] Defendant Wayne Kirkwood operates a service called Media Dial–Up which enables subscribers to listen to radio broadcasts in remote cities for a fee. Kirkwood intends Media Dial–Up to provide a means by which advertisers, people seeking to hire media talent, and other interested parties may monitor radio stations whose "over the air" broadcasts do not reach their areas. He does not make the service available to the general public. Rather, the service is analogous to the "listen lines" which some radio stations provide to some advertisers and perhaps others for monitoring their own broadcasts.

The mechanics of Kirkwood's service are conceptually simple. Kirkwood installs circuit boards of his own design in radio receivers and connects the circuit boards to telephone lines to which Kirkwood subscribes. The radio receivers pick up "over the air" broadcasts just like any other, but Kirkwood's electronics enable the receivers to be accessed by telephone from anywhere in the world and to be tuned by a caller to a frequency of the caller's choice by use of the caller's telephone key pad, thus enabling the caller to listen to the broadcast on the selected frequency over the telephone line.[5] He has placed such devices in major radio markets around the country and makes the unpublished telephone numbers which give access to his devices available to subscribers for a fee.[6] Subscribers thus may call Kirkwood's telephone number in a desired city, tune the Kirkwood receiver to a chosen station, and listen to whatever is being broadcast over the air by the station during the period in which the subscriber remains connected.

Infinity brought this action against Kirkwood in 1996 for copyright infringement, seeking only injunctive relief and statutory damages.[7] Kirkwood responded that his activities were both a fair use and exempted from liability by Section 111(a)(3). The parties agreed to a trial on a stipulated record.[8] This Court initially concluded that the Media Dial–Up service constituted a fair use and dismissed the action without considering the carrier exemption. The Second Circuit, however, reversed and remanded for consideration of that issue, which now is ripe for decision based on the record to which the parties stipulated.

## II

Section 111(a)(3) provides that the "secondary transmission of a primary transmission embodying a performance or display of a work of art is not an infringement of copyright if," so far as is relevant here:

1. "[T]he secondary transmission is made by [a] carrier,"

2. The carrier has "no direct or indirect control over the content or selection of [ (a) ] the primary transmission or [ (b) ] over the particular recipients of the secondary transmission," and

---

**2.** *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir.1998), *rev'g* 965 F.Supp. 553 (S.D.N.Y.1997).

**3.** Am.Cpt. ¶ 4.

**4.** Am.Cpt. ¶¶ 7–8.

**5.** Pre–Trial Order ("PTO") § III, ¶¶ 12–14.

**6.** PTO § III, ¶ 8.

**7.** PTO § II.

**8.** Stipulation and Order, Jan. 30, 1997, *Infinity Broadcasting Corp. v. Kirkwood*, 965 F.Supp. 553 (S.D.N.Y.1997).

3. The carrier's "activities with respect to the secondary transmission consist solely of providing wires, cables or other communications channels for the use of others." [9]

Plaintiff makes two arguments against carrier exemption for Kirkwood. First, it contends that Section 111(a)(3) never was intended to cover services such as Kirkwood's. Second, Infinity asserts that Media Dial–Up does not meet the specific requirements of Section 111(a)(3) and therefore is ineligible for the exemption.

*The Intended Coverage of Section 111(a)(3)*

Plaintiff's contention that services like Kirkwood's services are not what Congress had in mind in enacting Section 111(a)(3) is empirically correct, just as Congress could not have foreseen most of the technological developments that have affected the manner in which copyrighted works now are reproduced and disseminated.[10] Indeed, the legislative history of the Copyright Act contains references, as plaintiff suggests, to both common carriers and to the telephone company, indisputably the "carriers" then foremost in Congress' consciousness.[11] But the fact that defendant's particular technology was not specifically contemplated by Congress simply does not end the inquiry.

Congress wrote the Copyright Act of 1976 in the knowledge that we were at the brink of a communications revolution. It chose not to limit the Section 111(a)(3) exemption to common carriers or the tele-phone company, although it easily could have done so. Doubtless aware that the predecessor of the 1976 Act had governed the law of copyright for 67 years, it declined to lock itself in to the technology of the day, instead framing a statute in more general language.[12]

While it did not articulate the point in precisely these terms, the Second Circuit already has applied the carrier exemption in an entirely consistent manner. In *Eastern Microwave, Inc. v. Doubleday Sports, Inc.*,[13] the Court considered whether the carrier exemption of Section 111(a)(3) extended to a "resale" transmitter of television broadcast signals, which acquired those signals "off the air," converted them into frequencies in the microwave band, and retransmitted them via line-of-sight terrestrial repeater stations or a satellite transponder to the head ends of subscribing cable television systems. Noting that the case required "interpretation and application of statutes enacted before adoption of the involved communications arrangements" there at issue, the Circuit "'look[ed] to the "common sense" of the statute ..., to its purpose, [and] to the practical consequences of the suggested interpretations'" to construe the exemption,[14] thus implicitly holding that the exemption is not limited to the technology that existed at the time Congress passed the Act. And it went on to hold that the retransmitter came within the exemption notwithstanding the striking differences between its activities and those "of older,

---

9. 17 U.S.C. § 111(a)(3).

10. For another example, see *Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F.Supp.2d 191 (S.D.N.Y.1999) (digitized images of paintings on CD–ROMs).

11. *See, e.g., Copyright Law Revision: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary*, 94th Cong., 1st Sess. (1975) (statement of Barbara Ringer, Register of Copyrights) (exceptions include "common carriers who do nothing but send a signal on").

12. *See Eastern Microwave, Inc. v. Doubleday Sports, Inc.*, 691 F.2d 125, 129 n. 10 (2d Cir.1982), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983) (indicating that comparison to telephone company inappropriate in analyzing Section 111(a)(3) defense in light of statutory reference to "any carrier").

13. 691 F.2d 125.

14. *Id.* at 127.

established common carriers, e.g., the telephone company."[15]

This statute must be construed in a manner that will permit it to adapt to changing technologies, particularly in view of Congress' evident adoption of broad language susceptible of that approach. Accordingly, this Court holds that the fact that defendant employs technology that could not have been foreseen with specificity is not sufficient to deprive it of the benefit of the exemption. The dispositive question instead is whether Kirkwood's activities fit within the language that Congress enacted.

*The Requirements of Section 111*

It is undisputed that Kirkwood is engaged in secondary transmissions of Infinity's primary transmissions and that those primary transmissions embody performances. The areas in dispute are whether Kirkwood controls the selection of either the primary transmissions or the recipients of the secondary transmissions, whether his activities are limited to providing wires, cables or other communications channels, and whether he is a carrier.

*Control Over Selection of the Primary Transmission*

The protection of Section 111(a)(3) is available only to those secondary transmitters which exercise no direct or indirect control over selection of the primary transmission. Infinity argues that Kirkwood exercises control over selection of the primary transmission by selecting the broadcast stations he provides to his subscribers and by failing to block Infinity's stations despite possession of the technology to do so.

There is no evidence that Kirkwood selects stations to broadcast in a manner

sufficient to take his activities out of Section 111(a)(3). His receivers pick up all broadcasts of all stations in the markets in which they are deployed. They transmit to Kirkwood's subscribers those broadcasts that the subscribers, not Kirkwood, select by using the keypads on their telephones. The only selectivity on Kirkwood's part is in choosing which radio markets in which he places receivers, a choice which is constrained by resource limitations and which is unrelated to the content of the primary transmissions.

The requirement that a retransmitter abstain from controlling selection of the primary transmission is grounded in the proposition that "a carrier-retransmitter must avoid content control by retransmitting exactly what and all of what it receives. To do otherwise could be perceived as making the transmission his own."[16] In other words, content control, not technical capacity, is the proper focus of inquiry. As the Second Circuit wrote in holding that the reseller at issue in *Eastern Microwave, Inc.* came within the exemption, "[t]echnical constraints which force [the secondary transmitter] to make an initial, one time determination to retransmit the signals of a particular station, whatever the content of those signals, do not evidence the 'control over the content and selection of the primary transmissions' intended to be precluded by Section 111(a)(3)."[17]

This case is indistinguishable in principle from *Eastern Microwave*. There the reseller "selected" the primary transmission that was retransmitted by electing to retransmit the broadcasts of a particular television station, thus necessarily excluding others. It nevertheless was held not to have exercised control over the content of the signals retransmitted because there was no practical alternative to choosing

---

15. *Id.* at 127–28. *See also Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.,* 777 F.2d 393 (8th Cir.1985).

16. *Eastern Microwave,* 691 F.2d at 130.

17. *Eastern Microwave,* 691 F.2d at 130. *Accord,* 3 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 12.04[B][3] (1998) ("Nimmer").

one station to retransmit, and the defendant retransmitted exactly what the selected station transmitted. Here, Kirkwood does not even select the primary transmissions that are retransmitted. He merely selects the markets in which he places his devices, and his subscribers select the primary transmissions they wish to hear.

Nor is Infinity persuasive in its contention that Kirkwood's failure to block Infinity stations deprives him of the exemption. The argument simply has no grounding in the statute. In any case, the blocking of selected stations would be more akin to the forbidden content control than Kirkwood's current practice, which permits subscribers unfettered control of the selection of the primary transmissions that are retransmitted.

*Control over Particular Recipients of the Secondary Transmission*

Very much the same reasoning answers Integrity's contention that Kirkwood impermissibly selects the recipients of its secondary transmissions by making the unlisted dial-up phone numbers available only to his subscribers.

At a most superficial level, of course, the fact that Kirkwood makes his retransmissions available only to his subscribers and not to others involves a selection of the recipients of the retransmissions, just as his choice of markets in which to place his devices is a *de facto* choice that broadcasts of stations in those markets may be retransmitted while those of stations in other markets will not be retransmitted. But that simply is not enough.

The plaintiff in *Eastern Microwave* contended that the defendant reseller was not entitled to the Section 111(a)(3) exemption because it controlled the recipients of its retransmissions by delivering them only to those cable systems with which it had contracts. But the Second Circuit noted that the defendant was a common carrier

obliged by law to furnish its communications services upon reasonable request and that there was no evidence that it ever had refused to do so. It therefore held that the defendant had "not exercised 'control over the particular recipients' of its transmissions within the meaning and intent of 17 U.S.C. § 111(a)(3),"[18] stating that the fact that the defendant "renders its services to certain CATV systems and not others does not itself constitute ... any control, direct or indirect, over particular recipients."[19] And while Kirkwood is not a common carrier, there is no reason to conclude that this fact is material in light of Congress' failure to restrict the exemption to such entities.

Infinity argues also that Kirkwood exercises a second sort of control over the recipients of its transmissions, namely that Media Dial–Up controls the recipients because its business plan states a policy of terminating service to people, such as copyright infringers, who do not use the service for legitimate societal purposes. There is no evidence before the Court, however, that any subscriber has been terminated. In fact, Kirkwood's affidavit states that "[n]o instance of rebroadcasting by my subscribers," i.e., infringing activity, "has ever been reported, or alleged to have occurred, to me. No instances of sale of any rebroadcasting or recordings of rebroadcasts by my subscribers have ever been reported, or alleged to have occurred, to me."[20] The possibility that Kirkwood at some unknown future time might cut off a subscriber, most likely for the purpose of preventing that subscriber from using his service to infringe copyrights of Infinity or others, is insufficient to deprive Kirkwood of the exemption.

*Provision of Wires, Cables, or Other Communications Channels for the Use of Others*

Infinity protests that Kirkwood does not provide wires, cables or other communica-

---

**18.** *Id.* at 131.

**19.** *Id. Accord,* 3 NIMMER § 12.04[B][3], at 12–106 to 12–107.

**20.** Kirkwood Aff. ¶ 13. *See also* Kirkwood Dep. 115–116 (discussing termination of a subscriber hypothetically).

tions channels as the statute requires of an exempt carrier. It faults Kirkwood for "not lay[ing] cable, string[ing] wire, orbit[ing] a satellite, build[ing] microwave relay stations, or do[ing] anything remotely resembling the activities of a true passive carrier."[21] It cites no authority, however, for the proposition that the required communications channels must be as complex as satellites or microwave relay stations. And there is no doubt at all that Kirkwood's radio receivers, together with their circuit boards and telephone connections, constitute "communications channels," for they do precisely what the quoted language suggest—they pick up primary transmissions and convey them to telephone lines which in turn convey them to Kirkwood's subscribers. Indeed, this follows also from the fact that the critical passage in Section 111—that a carrier's "activities with respect to the secondary transmission [must] consist solely of providing wires, cables, or other communications channels for the use of others"[22]—is language of exclusion, not of required activity. In other words, the statute mandates that a carrier do no *more* than provide communications channels, not that it provide some minimum level of technology in performing its function. Like the prohibitions on content control and selection of recipients, the goal of this language is to ensure that only carriers which truly are passive conduits come within the exemption.

Accordingly, the Court finds that Kirkwood's activities "consist solely of providing wires, cables, or other communications channels for the use of others."

*Is Kirkwood a "Carrier"?*

There is little doubt that Congress employed the word "carrier" in Section 111(a)(3) because it sought to protect those "who do nothing but send a signal on."[23] The paradigmatic "carriers" protected by it are telephone companies, whose lines are used by subscribers without the companies' active participation to carry electronic signals of the subscribers' choice from one place to another.[24] Contrary to Infinity's suggestion, however, the exemption is not limited to common carriers such as the telephone company.[25] The question is whether Kirkwood is the sort of passive agent whose activities, given the findings already made, are within the intended scope of the exemption.

The history of the treatment of cable television under the current and 1909 Acts sheds some light on this question. Cable television, in its early days, involved the capture by the cable operator of broadcast signals and the retransmission of those signals over wires to cable subscribers. The question quickly arose whether cable systems' retransmission of copyrighted broadcasts constituted "performances" of the copyrighted works and therefore infringed the holders' exclusive rights. The Supreme Court, reasoning that the role of cable operators was closer to the passive role of a viewer than to the active role of

---

21. Pl.Mem. in Support of Pl.'s Motion for Summary Judgment,. at 25.

22. 17 U.S.C. § 111(a)(3).

23. *Copyright Law Revision: Hearings Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary,* 94th Cong., 1st Sess. 1821 (1975).

24. *See WGN Cont. Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 624 (7th Cir.1982).

25. *Eastern Microwave, Inc.,* 691 F.2d at 129 n. 10.

Infinity relies in part on Congressional testimony by a former Register of Copyright, who asserted three years after the enactment of the present Act that Section 111(a)(3) was intended to protect *only* telephone companies and that Congress intended "carrier" to mean "common carrier." *See Hearings Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary,* 96th Cong., 1st Sess. 32 (Nov. 26, 1979) (testimony of Barbara Ringer). But such retrospective testimony is of little value in ascertaining legislative intent.

performer, held that there were no performances.[26] The effect of the decision was to allow cable operators to profit from the systematic retransmission of copyrighted works free of liability for infringement.

Congress ultimately rejected this view. It concluded that "commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted materials" should pay royalties to the creators of the programming[27] and adopted a compulsory licensing scheme aimed at the cable industry in the 1976 Act.[28] To construe the word "carrier" in such a way that Kirkwood, who also is engaged in a commercial enterprise based on the carriage of copyrighted materials, would be exempt from liability under this provision would do violence to a fundamental premise of the 1976 revision. Although his limited activities pose little threat to the economic returns which the Act is designed to protect for copyright holders, any defense was to be found in the protection of fair uses—and the Circuit has ruled that he does not meet its requirements.

This view is supported also by " 'the "common sense" of the statute ... [and] the practical consequences of the suggested interpretations,' " considerations which the Court is obliged to take into account.[29] We live in an era of rapid technological change. The possibilities for the capture and retransmission of copyrighted material over the Internet, for example, are enormous.[30] Holding that Kirkwood is a "carrier," notwithstanding that the essence of his business is the retransmission of copy-

righted materials, would threaten considerable mischief.

Only time and additional cases will permit explication of the precise scope of the word "carrier" in Section 111(a)(3). For present purposes, the Court holds that Kirkwood, whose entire business consists of the retransmission of copyrighted or frequently copyrighted material, is not a carrier within the meaning of the statute.

## III

As previously indicated, Kirkwood concedes that his actions infringed Infinity's copyrights in three particular broadcasts unless he was protected from liability by the fair use or passive carrier defense, both of which now have been held to be unavailing here.[31] In consequence, the Court turns to Infinity's prayers for relief.

In view of the Court's holding on the merits, Infinity certainly is entitled to the declaratory judgment and injunctive relief it seeks, and there is no sufficient reason for denying it the costs typically available to a prevailing party in litigation. Its requests for statutory damages and attorney's fees, however, require greater consideration.

Section 504(c)(1) of the Act[32] permits a copyright owner to elect to recover, in lieu of actual damages, "an award of statutory damages for all infringements involved in the action, with respect to any one work, ... in sum of not less than $500 or more than $20,000 as the court considers just." Infinity has so elected. Hence, the

**26.** *Teleprompter Corp. v. Columbia Broadcasting System, Inc.,* 415 U.S. 394, 408–09, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 398–99, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968).

**27.** H.R.Rep. No 94–1476, 94th Cong., 1st Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5704.

**28.** 17 U.S.C. § 111(c) (1996 & Supp.1999).

**29.** *Eastern Microwave, Inc.,* 691 F.2d at 127.

**30.** *See, e.g., William M. Bulkeley, Radio Makes Waves on the Web,* THE NEWS AND OBSERVER (RALEIGH, N.C.), Aug. 16, 1998, G12 (describing availability of free software allowing user to capture radio broadcasts and retransmit on the Internet from any personal computer).

**31.** *Infinity Broadcasting Corp.,* 965 F.Supp. at 555 & n. 1.

**32.** 17 U.S.C. § 504(c)(1) (1998 & Supp.1999).

amount of statutory damages must be determined.

The evidence here establishes that Kirkwood infringed each of three October 8, 1996 broadcasts by performing each, as that term is defined in the Act, on one occasion.[33] As this litigation obviously was framed as a test case, Infinity has made no effort to prove that it is entitled to damages for any other infringements.[34] The question therefore is where in the range of $500 to $20,000 the award should be fixed for each infringement.

*Statutory Damages*

■ The statute itself is relatively uninformative concerning the factors that inform a determination of the amount of statutory damages. But it seems reasonably clear that the appropriate considerations include "the defendant's intent and the need to deter future violations" as well as "the economic benefits and detriments [of the infringement] to the plaintiff and defendant."[35]

■ In this case, there is no evidence that Infinity was harmed by the three infringements. In fact, the infringements consisted of the retransmissions of Infinity broadcasts to an Infinity agent, who called Kirkwood's service for the purpose of confirming its ability to retransmit.[36] Indeed, there is no persuasive evidence that Kirkwood's operation generally harmed Infinity in any way or, for that matter, benefitted Kirkwood, who consistently lost money on the venture. Nor was Kirkwood a rip-off artist, blatantly seeking to steal the intellectual property of another for his own benefit. On the contrary, Kirkwood had a well considered position that his activities did not infringe Infinity's rights on two independent bases. Although he ultimately did not prevail, his position certainly was not frivolous. There is no reason to suppose that he should be punished or that a substantial award is necessary for either general or specific deterrence. Accordingly, the Court finds that the appropriate award in each of the three cases is the statutory minimum of $500 and that Infinity therefore is entitled to recover damages in the aggregate amount of $1,500.

*Attorney's Fees*

■ Section 505 of the Act[37] permits the Court, in the exercise of discretion, to award a reasonable attorney's fee to the prevailing party in a copyright infringement action. In *Fogerty v. Fantasy, Inc.*,[38] the Supreme Court made clear that factors appropriately considered in exercising that discretion include " 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.' "[39] As the foregoing discussion indicates, none of these factors supports an award of attorney's fees here. Moreover, the manner in which Kirkwood, who appeared *pro se*, conducted this case was exceptionally responsible in that he readily stipulated to facts and expeditious modes of proceeding, thus facilitating the econom-

33. Pretrial order, § III, ¶ 18.

34. For example, there is no evidence that Kirkwood retransmitted any other Infinity broadcast for which Infinity has obtained a certificate of registration of copyright, the issuance of which is a prerequisite to bringing an action for damages for copyright infringement. 17 U.S.C. § 411 (1999).

35. *Guess?, Inc. v. Gold Center Jewelry*, 997 F.Supp. 409, 411 (S.D.N.Y.1998); *accord, e.g., F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952); *N.A.S. Import Corp. v. Chenson Enter.,*

*Inc.,* 968 F.2d 250, 252–53 (2d Cir.1992); *Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2d Cir.1986).

36. Pretrial order, § III, ¶ 18.

37. 17 U.S.C. § 505 (1998 & Supp.1999).

38. 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

39. *Id.* 534 n. 19, 114 S.Ct. 1023 (quoting *Lieb v. Topstone Ind., Inc.,* 788 F.2d 151, 156 (3d Cir.1986)).

ical handling of this litigation. Accordingly, the Court, in the exercise of discretion, denies Infinity's application for attorney's fees.

## IV

For the foregoing reasons, plaintiff is entitled to the declaratory judgment and injunctive relief it seeks as well as statutory damages of $1,500 and the costs of the action. The request for attorney's fees is denied. Settle judgment on or before September 22, 1999 on at least three business days' notice.

SO ORDERED.